UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CCP GOLDEN/7470 LLC; CCP COLONY OAKS 0767 LLC; CCP VALLHAVEN 0770 LLC; and CCP KENNEDY PARK 0771 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> KEVIN BRESLIN; WILLIAM G. BURRIS, JR.; MARY THERESA KHAWLY; and ELIA ZOIS, <br><br> Defendants. | No. 21 C 4081 <br><br> Judge Sara L. Ellis |

## OPINION AND ORDER

Plaintiffs CCP Golden/7470 LLC ("CCP Golden"), CCP Colony Oaks 0767 LLC ("CCP Colony Oaks"), CCP Vallhaven 0770 LLC ("CCP Vallhaven"), and CCP Kennedy Park 0771 LLC ("CCP Kennedy Park") owned property and buildings that housed four skilled nursing facilities ("SNFs") in Wisconsin. Defendant Kevin Breslin guaranteed the SNFs' lease payments and other obligations. After the SNFs failed to make their required payments and otherwise defaulted under the terms of their leases with Plaintiffs, Plaintiffs filed this lawsuit against Breslin and other guarantors, seeking to recover the damages Plaintiffs suffered when the SNFs breached their leases.[1] Plaintiffs have now moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 against Breslin. Because Breslin's request for additional discovery lacks merit, he has failed to create a genuine dispute of fact as to liability or damages, and Plaintiffs have sufficiently supported their damages requests, the Court grants Plaintiffs' motion.

---

[1] Plaintiffs obtained default judgments against Mary Theresa Khawly and Elia Zois. Doc. 33. William G. Burris, Jr. has not appeared, with Plaintiffs indicating that they intend to seek entry of a default judgment against him. Doc. 93.

The Court enters judgment against Breslin in the amount of $21,941,829.35 plus post-judgment interest.

## BACKGROUND

I.   **Breslin's Request for Additional Discovery**

Before recounting the relevant facts of this case, the Court must address Breslin's Rule 56(d) request to deny or defer consideration of Plaintiffs' motion for summary judgment and allow time for further discovery. Breslin claims that he cannot properly defend against Plaintiffs' motion given the pending criminal case against him in the United States District Court for the Western District of Wisconsin, *United States v. Breslin*, No. 23 CR 10 (W.D. Wis.). The indictment in Breslin's criminal case charges him with twelve counts of mail, wire, and health care fraud, as well as conspiracy to commit tax and money laundering offenses. *Id.*, Doc. 3. The indictment alleges that Breslin served as the managing member and CEO of KBWB Operations, LLC ("KBWB"), which owned and operated the SNFs at issue in this case. According to the indictment, Breslin and KBWB defrauded federal Medicare and Medicaid programs, as well as the Wisconsin Medicaid program, by diverting funds intended for the care of residents to themselves and others, thus causing the SNFs not to meet quality-of-care standards, among other things. Breslin's criminal case is set for trial on January 27, 2025. *See id.*, Doc. 52 (scheduling order dated June 14, 2024).

The Fifth Amendment protects an individual from "answer[ing] official questions put to him in any . . . proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 76 (1973). The privilege applies not only to answers that would implicate Breslin in a crime but also to "those that would furnish a link in the chain of evidence needed to prosecute [Breslin] for a

2

crime." *Shakman v. Democratic Org. of Cook Cnty.*, 920 F. Supp. 2d 881, 887 (N.D. Ill. 2013). "To be privileged by the Fifth Amendment to refuse to answer a question, the answer one would give if one did answer it (and answer it truthfully) must have *some* tendency to subject the person being asked the question to criminal liability." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663–64 (7th Cir. 2002); *see also Hoffman v. United States*, 341 U.S. 479, 486 (1951) ("The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination."); *In re Friedman*, 543 B.R. 833, 839 (Bankr. N.D. Ill. 2015) ("An individual does not have a free hand to refuse to answer any and all questions by virtue of the Fifth Amendment's self-incrimination clause."). In determining whether Breslin can validly invoke the privilege in this case, the Court considers whether (1) Breslin has a substantial and real fear of prosecution and (2) the specific answers would tend to subject Breslin to criminal liability. *In re Friedman*, 543 B.R. at 840–41. Breslin must make this showing as to each instance in which he invokes the Fifth Amendment, and he cannot rely on a blanket invocation of the privilege to do so. *Shakman*, 920 F. Supp. 2d at 888 (collecting cases). The Court may draw an adverse inference against an individual invoking the Fifth Amendment privilege in a civil case. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir.1995).

Breslin argues that he has been unable to participate in discovery and that he has appropriately invoked his Fifth Amendment right against self-incrimination given the significant overlap between the allegations in his criminal case and this case. Specifically, Breslin contends that the indictment concerns whether Breslin and KBWB had sufficient funds to pay the expenses for the SNFs involved in this case. The magistrate judge, presiding over discovery in

3

this case, rejected the exact same argument when Breslin previously sought a stay of proceedings. Doc. 74.[2] As the magistrate judge already found:

> The civil case in this matter is a contract dispute involving leases of property and the personal guarantees on those leases provided by Breslin and the other defendants. The pending criminal matter . . . concerns specific fraudulent mailings and wirings, violation of Medicare and Medicaid regulations to defraud the government, conspiracy to commit tax fraud and money laundering. Although both of these matters facially involve the SNFs, in terms of actual overlap of cases, there is little in common between the matters. The civil case will involve proving the breach of the lease contracts. The criminal matter concerns the specifically charged mailings and wirings; the standard of operation of the SNFs and how those legal requirements were or were not met, Breslin's role in the management of the SNFs, and the alleged fraudulent diversion of money that should have gone into the operation of the SNFs. Breslin's intent, or any fraudulent intent, will be at issue. Those matters are not at issue in the civil case, which seeks only to determine if there was a valid and enforceable contract between Plaintiffs (who are not parties to the criminal case) that was breached by the Defendants. These issues do not present, as Breslin claims, an "overlap of issues," (Mot. at 4), or at least an overlap significant enough to swing the first factor in his favor on his request to stay discovery.

Doc. 74 at 5–6. Nothing has changed since the magistrate judge's denial of Breslin's motion for a stay that would warrant deferring the motion for summary judgment in light of Breslin's criminal case. Indeed, undermining Breslin's argument, after the denial of the stay, Breslin agreed that the court need not extend fact discovery and that the case could proceed to dispositive motion practice. Docs. 79–80. Thus, the Court finds Breslin's Rule 56(d) request disingenuous, designed merely as another attempt to delay this case from reaching its end.

Additionally, the overbreadth of Breslin's invocation of the Fifth Amendment privilege becomes particularly evident when considering his responses to Plaintiffs' Local Rule 56.1 statement of facts, in which he refuses to answer every single statement on the grounds of self-

---

[2] The Court also notes that a prior district court judge presiding over this case also rejected Breslin's arguments for a pre-indictment stay on August 16, 2022. Doc. 42.

incrimination, including that Plaintiffs previously owned the premises that the SNFs leased and the terms of the various agreements at issue in this case. *See Shakman*, 920 F. Supp. 2d at 891 ("A witness must offer some credible reason why a response would pose a real danger of incrimination and not just a 'remote and speculative possibility.'" (citation omitted)). The Court thus finds that Breslin's blanket assertion "undermines [his] claim that [he] has an objectively reasonable fear of prosecution." *Shakman*, 920 F. Supp. 2d at 890.

Because Breslin has failed to identify any discovery or issues that would warrant the invocation of the Fifth Amendment privilege here, the Court denies his Rule 56(d) request. And because Breslin failed to cooperate in discovery and has consistently invoked his Fifth Amendment right against self-incrimination without providing a sufficient basis for doing so, the Court finds it appropriate to treat as admitted Plaintiffs' statements of fact, which Plaintiffs have supported with record evidence. *See La Salle Bank*, 54 F.3d at 391 (approving the practice of deeming admitted facts supported by evidence where the non-moving party invoked its Fifth Amendment right in responding to those facts); *F.T.C. v. Oks*, No. 05 C 5389, 2007 WL 3307009, at *3 (N.D. Ill. Nov. 2, 2007) ("Although unsupported allegations may not be deemed admitted, allegations supported by other proof may be deemed admitted because then the Fifth Amendment inference is, as it should be, only one factor in determining guilt or liability.").

## II. Facts[3]

### A. Relevant Agreements

Plaintiffs are subsidiaries of Sabra Health Care REIT, Inc. ("Sabra") and previously owned the premises used by the four SNFs at issue in this case. On June 20, 2003, CCP Golden entered a lease agreement (the "Chilton Lease") with Chilton Care Center, LLC ("Chilton

---

[3] As discussed above, the Court derives the facts set forth in this section from Plaintiffs' Local Rule 56.1 statement of facts as supported by the evidentiary record. The Court takes these facts in the light most favorable to Breslin, the non-movant.

5

Tenant") for one of the SNF premises in Chilton, Wisconsin. Chilton Tenant's parent company, Rice Enterprises, guaranteed Chilton Tenant's obligations under the Chilton Lease. In August 2014, KBWB Operations-Rice, LLC ("KBWB Rice"), of which Breslin was a member, purchased Chilton Tenant's equity. CCP Golden consented to the sale on certain conditions, including that KBWB Rice, Breslin, and others jointly and severally guarantee Chilton Tenant's obligations under the Chilton Lease. To that end, on December 31, 2014, Breslin and others executed a guaranty in favor of CCP Golden (the "Chilton Individual Guaranty"), in which they unconditionally guaranteed payment of all amounts and the performance of all other obligations owed to CCP Golden under the Chilton Lease.

On December 31, 2015, CCP Colony Oaks, CCP Vallhaven, and CCP Kennedy Park (the "Master Lease Landlords") entered into an agreement (the "Master Lease") with 601 Briarcliff Drive Operating Company, LLC; 125 Byrd Avenue Operating Company, LLC; and 6001 Alderson Street Operating Company, LLC (collectively, the "Master Lease Tenants"). The Master Lease covered the leasing of the three remaining SNF premises. That same day, Breslin and others executed guarantees of the Master Lease in favor of the Master Lease Landlords (the "Master Lease Individual Guaranty"). As with the Chilton Individual Guaranty, Breslin unconditionally guaranteed payment of all amounts and the performance of all other obligations that the Master Lease Tenants owed to the Master Lease Landlords under the Master Lease.

The Chilton and Master Leases both included a provision giving Chilton Tenant and the Master Lease Tenants (collectively, the "Tenants") the option to purchase the premises. The Tenants decided to exercise these options, entering into the Purchase Option Exercise Agreement with Plaintiffs on April 17, 2017. Instead of paying an earnest money deposit, the Tenants agreed that, in the event of a default, they would pay Plaintiffs liquidated damages in the amount

6

of the earnest money deposit provided for under the Chilton and Master Leases, subject to a $105,278 reduction for the Master Lease only. The parties agreed that the liquidated damages obligation constituted a monetary obligation of the Tenants and additional rent under the Chilton and Master Leases. In connection with the Purchase Option Exercise Agreement, Breslin and the other guarantors reaffirmed their guarantees of the Chilton and Master Leases and specifically acknowledged and agreed to the obligation to pay liquidated damages under the Purchase Option Exercise Agreement.

**B.     Events of Default**

Both the Chilton and Master Leases required the Tenants to pay minimum monthly rent before the first business day of each month. The Tenants' failure to make the minimum rent payment within five days of the due date amounted to an event of default. The Master Lease Tenants did not make the minimum rent payment in August 2018 and thereafter. Chilton Tenant did not make its September 2018 minimum rent payment and any payments thereafter.

The Chilton and Master Leases also made the appointment of a receiver for the Tenants or their property an event of default. The leases also required the Tenants to continuously use and occupy the premises as skilled nursing facilities throughout the terms of the leases, with an event of default occurring upon the revocation of any license needed to operate the SNFs. On September 7, 2018, MidCap Funding IV Trust and MidCap Funding VII Trust (collectively, "MidCap") filed a lawsuit in Wisconsin state court against Tenants, KBWB Rice, and others related to their defaults under loans from MidCap. That same day, the court, with the defendants' consent, appointed a receiver to operate the SNFs. The receiver later relocated all the SNF residents, causing the SNFs to lose their licenses and operating permits.

Finally, despite the closing date for the purchase of the SNF premises being extended to March 31, 2019 and the lease terms through January 31, 2026, the Tenants did not close on the purchase of the premises.

### C. Plaintiffs' Mitigation Attempts

According to Peter Nyland, the Executive Vice President of Asset Management for Sabra, after the Tenants' defaulted in failing to pay the minimum rent, Plaintiffs engaged Blueprint Healthcare Real Estate Advisors, LLC ("Blueprint") as an advisor and Vernick & Associates, Ltd. ("Vernick") as a broker on October 5, 2018 to relet or sell the four premises. Sabra regularly uses Blueprint to find prospective tenants and purchasers for healthcare properties. Blueprint prepared an offering memorandum for the premises, which it then marketed to over 100 prospects. Unfortunately, Blueprint failed to find a potential buyer or lessor, despite its best efforts. In March 2019, Sabra then asked Blueprint to help it find a local real estate agent to market the premises. Because by that time the premises were not operating as skilled nursing facilities, Sabra chose to retain Collier's International to market the premises for sale. The best offer it received for the premises was for $1,000,000. Plaintiff ultimately agreed to this offer, selling the premises for $1,000,000 on December 5, 2019.

### D. Damages

According to Plaintiffs, they suffered at least $21,941,829.35 in damages because of the Tenants' breaches of their agreements. Plaintiffs have not recouped any of these amounts from the Tenants, Breslin, or the other guarantors. The specific amounts that Plaintiffs seek to recover from Breslin follow.

1. **Unpaid Rent**

First, Plaintiffs present evidence that they are entitled to $1,528,614.55 in unpaid rent from the time of their default (in August and September 2018) through December 2019, when Plaintiffs sold the premises. Additionally, the Chilton Lease allowed CCP Golden to collect the acceleration of all minimum rent that accrued after the termination of the lease. The Master Lease allowed the Master Lease Landlords to sue for the net present value of all rent that would have accrued after termination of the Master Lease, computed using a discount rate reasonably determined by the Master Lease Landlords. Using a discount rate of 8%, Plaintiffs have presented evidence that the net present value of the accelerated minimum rent for the remaining term of the leases (from January 1, 2020 through January 31, 2026) is $5,796,267.04.

2. **Loss of Value of the Premises**

Plaintiffs expected that, at the end of the lease terms, the premises would continue to house licensed and operating skilled nursing facilities. According to Nyland, the loss of the SNFs' licenses significantly diminished the value of the premises. Nyland indicates that the value of premises with operating skilled nursing facilities is often calculated by taking the annual amount for which the premises could be leased to an operator under a triple net lease such as the Chilton and Master Leases and dividing that number by a capitalization rate. Nyland estimates a reasonable capitalization rate for the SNFs of 9.5%. Thus, based on the annual rental rate of the last year of the Chilton and Master Lease terms, Plaintiffs expected to own premises with a value of $13,506,563.26 at the end of the lease term. The net present value of that amount as of September 14, 2023, based on an 8% discount rate, is $11,242,872.24.

Taking into account the $1,000,000 that Plaintiffs received when they sold the premises, as well as the $62,430 in costs they incurred in connection with the sale, Plaintiffs represent that

the loss of value of the premises due to the Tenants' failure to continuously operate the premises as skilled nursing facilities through the end of the lease term amounts to $10,305,302.24.

### 3. Real Estate Taxes

The Chilton and Master Leases obligated the Tenants to pay real estate and property taxes during the lease terms. After the Tenants' default but before Plaintiffs sold the premises, Plaintiffs paid $340,811.85 in real estate and property taxes on the premises.

### 4. Liquidated Damages

Under the Purchase Option Exercise Agreement, the Tenants' failure to close the purchases of the premises after exercising their options obligates them to pay liquidated damages. As provided for in the Purchase Option Exercise Agreement and the Chilton and Master Leases, the liquidated damages amount to 7.5% of the agreed upon purchase price, with a $105,278 reduction for the Master Lease premises. In the Second Amendment to the Purchase Option Exercise Agreement, the parties agreed to a $16,052,660.30 purchase price for the premises. Using this number, the Tenants owe $1,098,670.93 in liquidated damages.

### 5. Late Fees

The Master Lease entitles the Master Lease Landlords to a late fee of 4% on all amounts due that the Master Lease Tenants did not pay within five days of the due date. It also entitles the Master Lease Landlords to interest at the rate of 4% above the prime rate on all amounts due under the lease that is over ten days overdue. Using these numbers, the Master Lease Tenants owe the Master Lease Landlords $207,761.96 in late fees on unpaid minimum rent, with the accompanying interest totaling $1,889,148.63 as of September 14, 2023.

The Chilton Lease entitles CCP Golden to a 5% late fee for all amounts that Chilton Tenant owes that it did not pay within five days of the due date, along with interest at 5% above

the prime rate for all outstanding amounts starting ten days after the due date until paid. Using these numbers, Chilton Tenant owes CCP Golden $56,541.63 in late fees on the unpaid minimum rent and $458,485.94 in interest as of September 14, 2023.

### 6. Utilities and Maintenance Costs

Finally, the Chilton and Master Leases obligated the Tenants to maintain the premises and make all repairs necessary. The Tenants also agreed to incur all other operating expenses for the premises. Plaintiffs incurred $260,224.57 in utilities and maintenance costs from the time that the receiver stopped operating the SNFs until Plaintiffs sold the premises.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719

11

F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

**I.     Liability**

Plaintiffs contend that Breslin breached the Chilton Individual Guaranty and the Master Lease Guaranty, entitling them to damages. To establish that Breslin breached these guarantees, Plaintiffs must prove: "(1) the original indebtedness; (2) the debtor's default under their indebtedness; and (3) the guaranty." *BFG Corp. v. Venture Equip., LLC*, No. 22-CV-3502, 2023 WL 358787, at *3 (N.D. Ill. Jan. 23, 2023).[4] Breslin does not contest that Plaintiffs have proven these three elements. Plaintiffs have introduced the Chilton and Master Leases, which establish the Tenants' indebtedness. The record also reflects that the Tenants defaulted under the Leases by failing to make the minimum rent payments beginning in August 2018 for the Master Lease and September 2018 for the Chilton Lease, having a receiver appointed over them and the SNFs, and losing the licenses for the SNFs during the receivership. Finally, Plaintiffs have shown that Breslin unconditionally guaranteed the Tenants' payments and obligations under the Chilton and Master Leases, as well as his failure to satisfy any of these obligations. Therefore, the record requires finding Breslin liable to Plaintiffs for breach of the Chilton Individual Guaranty and the Master Lease Guaranty.

---

[4] Both guarantees provide that Illinois law applies.

12

## II.     Damages

The Court next turns to Plaintiffs' damages request.  The Court can determine damages at the summary judgment stage if no issues of material fact exist on the question.  *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 795 (7th Cir. 2014).  Here, Plaintiffs have submitted Nyland's declaration, in which he explains how Plaintiffs calculated the damages they request under the Chilton and Master Leases, and, in turn, Breslin's guarantees.  Breslin does not present any evidence to rebut these amounts.  The Court thus turns to his legal arguments as to the propriety of certain of Plaintiffs' requests.

### A.     Plaintiffs' Mitigation Efforts

Breslin contends that Plaintiffs have not provided any evidence of the steps they took to mitigate damages.  Initially, Plaintiffs argue that a guarantor, like Breslin, cannot take advantage of a duty to mitigate defense.  While one court has questioned the availability of this defense to a guarantor in Illinois, *see WEC986-4 LLC v. Saks Inc.*, No. 20 C 4363, 2020 WL 7183745, at *4 (N.D. Ill. Dec. 7, 2020) (noting the "dubious" nature of the proposition), others have extended it to guarantors, *see WEC 98C-5 LLC v. Saks Inc.*, No. 20-cv-03970, 2022 WL 22858802, at *2 (N.D. Ill. Sept. 26, 2022) (collecting cases and finding that the Illinois statutory requirement that landlords mitigate their losses found in 735 Ill. Comp. Stat. 5/9-213.1 runs in favor of guarantors as well).[5]  The Court need not decide this issue, however, because Breslin has not pointed to any

---

[5] Although Illinois law applies to the guarantees at issue here, Plaintiffs point out that Wisconsin law, which applies to the underlying Chilton Lease, does not allow a guarantor to raise a failure to mitigate defense.  *See Olive Portfolio, LLC v. Harrill*, 2014 WI App 45, ¶ 11 ("Any lingering doubt concerning whether a failure-to-mitigate defense could defeat a guaranty-of-payment claim was resolved in [*Park Bank v. Westburg*, 2013 WI 57]. . . . Suffice it to say, the court held that the failure-to-mitigate affirmative defense is unavailable to a guarantor of payment.").

13

evidence in the record that creates a question of fact as to whether Plaintiffs did not mitigate their damages.[6]

Breslin appears to contend that Plaintiffs should have sold the premises before December 2019, given that the Tenants' breaches began in August 2018. He also argues that Plaintiffs should have obtained a higher price for the premises. But he presents no evidence that would allow a jury to conclude that Plaintiffs did not act reasonably in pursuing the sale of the premises. Instead, the evidence of record suggests that Plaintiffs acted diligently to mitigate their damages: engaging Blueprint as an advisor and Vernick as a broker to relet or sell the premises on October 5, 2018 to no success despite marketing the premises to over 100 prospects; retaining a different broker, Collier's, once the SMFs had stopped operating in early 2019; and ultimately accepting the best offer they received and selling the premises for $1,000,000 on December 5, 2019. Without any contrary evidence, no reasonable jury could find a question exists as to mitigation of damages, and so Breslin's attempt to reduce the damages award on this basis fails.[7]

---

[6] Plaintiffs assert that Breslin has the burden of proof to present evidence that Plaintiffs did not mitigate their damages. Although a defendant generally bears the burden of proof on a failure to mitigate defense, with respect to the measure of damages under § 9-213.1, Illinois courts have placed the burden of proof on the landlord, noting that the "landlord is in the best position to present evidence of its reasonable efforts to mitigate losses." *Kulhanek v. Casper*, 2023 IL App (1st) 221454, ¶ 36. Thus, the Court does not credit this argument of Plaintiffs.

[7] Although Plaintiffs did not raise this argument, the Court also questions whether Breslin waived the ability to raise a failure to mitigate defense. The Chilton Individual Guaranty and Master Lease Guaranty both provide:

> Guarantor shall not interpose any counterclaim or counterclaims or claims for set-off, recoupment or deduction of rent in any action brought by Landlord against Guarantor under this Guaranty. Guarantor shall not be entitled to make, and hereby waives, any and all defenses against any claim asserted by Landlord or in any suit or action instituted by Landlord to enforce this Guaranty or the Lease. . . . The liability of Guarantor under this Guaranty is primary and unconditional.

Doc. 84-5 ¶ 4.2 (capitalization omitted); Doc. 84-7 ¶ 4.2 (capitalization omitted). The Seventh Circuit recently found that similar language amounted to a waiver of the guarantor's right to assert any defenses,

B.     **Accelerated Minimum Rent**

Next, Breslin argues that Plaintiffs cannot recover the accelerated minimum rent for the remainder of the lease term (from December 2019 to January 2026) because they no longer hold an ownership interest in the premises and so the requested damages function as a penalty and result in a windfall to Plaintiffs. "Damages for breach of contract are intended to place the nonbreaching party in the same position as if the contract had been performed." *Union Tank Car Co. v. NuDevco Partners Holdings, LLC*, 2019 IL App (1st) 172858, ¶ 44. While "Illinois common law does not recognize a present obligation to pay future rent in the event of a breach of contract," parties can agree to such damages by way of a contractual provision to that effect. *Id.* ¶ 44–46. Here, the Chilton and Master Leases include such provisions, specifying the acceleration of all minimum rent upon an event of default. Doc. 84-4 ¶ 13.1; Doc. 84-6 ¶ 8.2(c). And while Breslin correctly points out that "an undiminished full acceleration of the future rents . . . amounts to an unenforceable penalty," *MAC Funding Corp. v. O.B. Moplastic Int'l, Inc.*, No. 97 C 333, 1997 WL 28307, at *1 (N.D. Ill. Jan. 21, 1997), Plaintiffs have discounted their request and only seek the present value of the future rent obligations, *see Nat'l City Healthcare Fin. v. Refine 360, LLC*, 607 F. Supp. 2d 881, 882 (N.D. Ill. 2009) (appropriate measure of damages for lessee's breach includes "the present value of the future installments of lease-prescribed rent up to the end of the lease term"). Therefore, the Court finds Plaintiffs' request for accelerated minimum rent proper and awards the requested amount to Plaintiffs.

---

including a failure to mitigate defense. *WEC 98C-3 LLC v. SFA Holdings Inc.*, 99 F.4th 961, 969–70 (7th Cir. 2024) (that guarantor "shall not be subject to any reduction, limitation, termination, *defense*, offset, counterclaim or recoupment" if tenant defaulted on lease meant that guarantor waived the right to assert affirmative defenses to the default).

15

      **C.     Diminution in Value Due to the Loss of the SNFs' Operational Licenses**

      Next, Breslin argues that Plaintiffs cannot recover for the diminution in value of the premises due to the SNFs' loss of their operational licenses. Initially, he contends that Plaintiffs have not shown that they attempted to mitigate their damages, but the Court has already disposed of this argument above. To the extent Breslin challenges Plaintiffs' ability to obtain an award for the diminution in value, the Chilton and Master Leases required Tenants to turn over fully operational and licensed SNFs to Plaintiffs at the end of the terms. In other words, Plaintiffs anticipated having fully operational SNFs in the premises at the time of the Leases' expiration, making the request appropriate. *See Nat'l City Healthcare Fin.*, 607 F. Supp. 2d at 882 (damages flowing from a lessee's breach include "the present value of the anticipated fair market value of the leased property at the end of the lease term (when it would have reverted to the lessor in the ordinary course)").

      Breslin also argues that Plaintiffs rely only on speculation in calculating the amount of loss. While Breslin correctly notes that Plaintiffs cannot recover speculative damages, *see, e.g.*, *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 17, Plaintiffs have sufficiently set forth a basis for their $10,305,302.24 request for the diminution in value of the premises due to the SNFs' loss of their operational licenses. In the absence of evidence from Breslin to the contrary, the Court only has before it Nyland's declaration, which suffices to provide a reasoned basis for their request. *See Hanover Ins. Co.*, 751 F.3d at 795–96 (at summary judgment, uncontradicted affidavit of inside counsel stating the amount billed by outside counsel sufficed to support award of contractual damages in that amount). Nyland calculated the anticipated net present value of the residual value of the premises at the end of the leases' terms, subtracting from that the sales proceeds Plaintiffs received but adding back in the

16

costs they incurred in pursuing the sale. This figure falls well below the $16,000,000 that the Tenants agreed to pay for the premises prior to their default, underscoring that Plaintiffs' request does not amount to a windfall. *Cf. 1472 N. Milwaukee Ave.*, 2013 IL App (1st) 121191, ¶ 17 ("The compensation awarded in a breach of contract action should not provide plaintiff with a windfall recovery.").

### D. Liquidated Damages

Finally, Breslin challenges Plaintiffs' claim to $1,098,670.93 pursuant to the liquidated damages provision of the Purchase Option Exercise Agreement. "The purpose of a liquidated damages provision is to provide parties with a reasonable predetermined damages amount where actual damages may be difficult to ascertain." *Karimi v. 401 N. Wabash Venture, LLC*, 2011 IL App (1st) 102670, ¶ 27. Courts typically enforce liquidated damages provisions "if the parties have expressed their agreement in clear and explicit terms and there is no evidence of fraud or unconscionable oppression, a legislative directive to the contrary, or a special social relationship between the parties of a semipublic nature." *Hartford Fire Ins. Co. v. Architectural Mgmt., Inc.*, 194 Ill. App. 3d 110, 115 (1990). But "for reasons of public policy, a liquidated damages clause which operates as a penalty for nonperformance or as a threat to secure performance will not be enforced." *Jameson Realty Grp. v. Kostiner*, 351 Ill. App. 3d 416, 423 (2004). Illinois courts typically enforce liquidated damages provisions where "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove." *Grossinger Motorcorp, Inc. v. Am. Nat'l Bank & Tr. Co.*, 240 Ill. App. 3d 737, 749 (1992). The validity of a liquidated damages provision is a question of law, *id.*, with

17

Breslin having the burden of proving that the provision operates as a penalty, *Pav-Saver Corp. v. Vasso Corp.*, 143 Ill. App. 3d 1013, 1019 (1986).

Here, Breslin has made no substantive argument nor introduced any evidence that would support finding that the liquidated damages provision operates as a penalty and cannot be enforced. Instead, he merely argues that Plaintiffs have not shown the reasonableness of the requested amount. But this improperly attempts to flip the burden on the issue and thus does not suffice at the summary judgment stage. *See XCO Int'l Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1003 (7th Cir. 2004) ("PacSci has tried to reverse the burden of proof, which, as in the case of other affirmative defenses, rests on the party resisting enforcement of a liquidated damages clause to show that the agreed-upon damages are clearly disproportionate to a reasonable estimate of the actual damages likely to be caused by a breach."). As Plaintiffs point out, the parties agreed to liquidated damages that amounted to 7.5% of the purchase price, an amount falling well within the bounds of what Illinois courts have upheld as reasonable. *See Karimi*, 2011 IL App (1st) 102670, ¶ 24 (collecting cases upholding liquidated damages provisions of 15 to 20% of the purchase price). Without a substantiated basis to find the liquidated damages provision unenforceable, the Court awards Plaintiffs their requested amount.

E.  **Summary**

In summary, because Breslin has failed to demonstrate a genuine dispute of fact as to any of Plaintiffs' requested damages and has not provided a legal basis for finding that Plaintiffs cannot recover these amounts, the Court awards Plaintiffs the following in damages:

| | |
|---|---:|
| Unpaid Minimum Rent | $7,324,881.59 |
| Lost Value of the Premises | $10,305,302.24 |
| Real Estate and Property Taxes | $340,811.85 |
| Liquidated Damages from Failure to Close Purchase | $1,098,670.93 |
| Late Fees and Interest through September 14, 2023 | $2,611,938.17 |
| Utility and Maintenance Costs | $260,224.57 |
| **Total** | **$21,941,829.35** |

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for summary judgment [84]. The Court enters judgment for Plaintiffs and against Breslin in the amount of $21,941,829.35 plus post-judgment interest.

Dated: August 28, 2024

_____
SARA L. ELLIS
United States District Judge